Chief Judge David Folsom from the Eastern District of Texas. He has generously agreed to supplement our panels today and tomorrow. We appreciate his work both on the trial bench and assisting us here this week. So welcome, Judge Folsom. I'm honored to be here. It's an honor to be with you. We have four cases on our list today. Two are being submitted just on the briefs without approval, 1543 from 2009 and DeSanto v. Office of Personal Management Appeal 3049 from the current year. On our argument list, we'll hear argument first in Del Rosario v. Department of Veterans Affairs. Mr. Liffman, good morning to you. Welcome to the Court. Please proceed. Thank you, Your Honor. My name is Mark Liffman and I represent Mr. Del Rosario in this appeal. I'd like to direct the Court's attention to the waiver argument first, that is, whether Mr. Del Rosario knowingly and intelligently waived his constitutional right to a hearing. Now, there's no dispute that the waiver had essentially a twofold impact. First, it prevented the trier of fact, the hearing officer, from witnessing live examination so that it could make a thorough and accurate credibility determination. Why do you say that? If the examiner, if that's the right term, in the Manila office wanted to hear live testimony, he has subpoena power. He could subpoena the same witnesses who provided statements or affidavits or depositions. Well... Isn't that right? I'm not sure. I would tend to agree with you, Your Honor. I think it's the government's position that if the veteran waives the right, then there's no point to have a hearing. You can't. The court or the VA does not have suspending power to order a hearing. I think it does and it has an obligation. It has the power to subpoena witnesses, so unless you can show that that power wouldn't apply to this sort of a forfeiture hearing, it seems to be plain that if the Veterans Administration authorities thought it was important to be able to eyeball the witnesses as part of assessing their credibility, those witnesses could have readily been subpoenaed. So your argument that there can't be a proper credibility assessment here just isn't true. Well, I would disagree with you, Your Honor. I think what we have is a de facto summary judgment proceeding, and I just don't see, given all the conflicting evidence, how anyone could look at a cold paper record and assess who's telling the truth and who's lying. But the regional officers gave proper notice. I mean, there's a written notice. You have a right to a hearing with counsel if desired. It goes on to state the purpose of the hearing, the examined contentions, and your point of view, and he, Mr. Del Rosario, does not take that opportunity. How can you argue waiver? Well, you can argue that he waived it. The argument is whether he knowingly, intelligently did so. Does the Constitution require simply an affirmation, yes, I waive it, or does it require some educated decision? Well, the notice also included a phone number and said if you have any questions, write the officer, call this phone number. Now, did he take advantage of that? Well, I don't know if he did or not. He probably did not, but I'm not sure that that would be enough to just put him on inquiry notice. I mean, if there's something that he... Well, how more do you feel the notice should have provided? What I feel it should have done is basically two things. One, say, look, live, calling a hearing and providing live testimony, your own and others, might be beneficial to you and explain why. Explain that it'll allow the trier of fact to evaluate the testimony as it's given live and make proper credibility determinations accordingly. By waiving, you're preventing the trier of fact from this benefit, from the truth-seeking function that he's really there for. I mean, no one can doubt that a hearing and having people... Is it the Veteran Department obligation to function as if they were the private attorney hired by Del Rosario? I do. And I do in this particular case. When they're operating in an adversarial situation, which is quite anomalous in their typically pro-claimant function, I do believe. And also I have to look at 5904 has been recently amended to allow attorneys to be paid, to be compensated to represent veterans after a notice of disagreement. At this time, he couldn't get an attorney and pay for it. And under Jockway, it's pretty clear that the effect of that ban is to preclude attorney representation. So he's forced to be a sui sponte claimant. He could have had a non-attorney advisor. He could have had a veterans organization advisor to whom he could have directed questions and from whom he could have received advice that would have highlighted the very points you were saying should have been highlighted. I guess it depends on how you look on the Comer case. The Comer case says that... My point is, why isn't it his own passivity and inaction that caused him to be less informed perhaps than he might otherwise have been because he didn't consult anybody? Well, you could look at it that way. You could look at it, this is a quasi-criminal proceeding. And if a criminal defendant is improperly informed, improperly advised of all his constitutional rights and the effect of it, can he waive it? You say it might be beneficial. It might also be detrimental in precisely this circumstance. And so the government has every right to assume that he's made a choice not to appear, perhaps to subject himself to criminal sanctions if he is nailed down on a fraud charge. Why can you assume that? You assume that if you don't ask me... I'm not assuming anything, but... The point is, you start with the thing that you need to educate the veteran. You don't assume anything. That's my baseline. But where's the lack of education? But what's the lack of education here? Lack of education is two. One, he's not aware that the trier fact can make a better credibility determination on live testimony than on a written record.  He needs to calculate. He needs to think about it and make an informed decision. Mr. Lippman, would you please be careful to only start your answer after the judge's question has concluded? Sorry, I apologize, Your Honor. No, no, please proceed. And the other aspect of it is, it's my contention that the VA in this quasi-criminal proceeding had an obligation to get the witnesses, their witnesses, to prove its case beyond a reasonable doubt. And now the government's saying, well, look, we don't have an obligation because he waived the right. Well, does that fly in the face of Callahan versus the Department of Navy, where this court reversed the Married Systems Protection Board for conducting the hearing without the claimant being present? How do you reconcile those two? Well, I did, in my reply brief, in a footnote, Your Honor, I did, just to address your argument here. It's not necessarily my argument. I'm just asking you. Yeah, I mean, I don't think Callahan is on point. I think the most that can be made of Callahan is that the right to a hearing belongs to the claimant or to the employee alone, but that the government can't exploit that right by taking advantage of his unexcused absence. I mean, the facts in that case were there was an unexcused absence of the employee at the hearing, and they said, well, we're going to go ahead without him. So the facts aren't before it, and the issue of a knowing, intelligent waiver of a right to a hearing wasn't before the court, so I just don't think it's presidential on any relevant point. You seem to be saying that the VA, in your view, had an obligation to discuss the potential benefits, but also the downside risks. That seems like an impossible role for the VA to undertake. It might be something that a counselor, lawyer or not, could undertake, but I don't see how the VA would be in a position without a conflict of interest to be encouraging somebody to either have a live hearing or to elect not to have a live hearing by the way that they emphasized either the potential benefits or the potential risks. That would be a terrible situation to put the VA in. That's their argument. My response to it, and to your statement, Your Honor, is that I don't think it's inaccurate or is a loaded or an impossible warning to say it might be beneficial to your case. It is beneficial, and explain why, to the extent that a trier of fact can evaluate the credibility. Yeah, but as Judge Rader has pointed out to you twice, that might be an adverse assessment of credibility. He might be worse off if he appears live and duels on credibility with the government's witnesses, the applicateur and the two widows. You're assuming that he's going to benefit, but it might well be that he would suffer rather than benefit. No, Your Honor, I'm not assuming that he's going to benefit. My assumption is that he should be educated to make his own determination. Well, what about the California Veterans Organization? The notice by the Department indicated that a copy of that very lengthy notice had been sent to the Oakland California Veterans Organization because he, Del Rosario, had listed them as his representative. Why wasn't that source of advice about the potential benefits or risks of a hearing sufficient? I don't recall what that notice stated, Your Honor. No, you have the notice, and at the end of it, it says a copy of this notice has been sent to the California Veterans Organization in Oakland, California because you, Del Rosario, listed them as your representative. Okay, so I still don't... Well, why isn't that organization in a position to give him the very kind of counseling that you're saying he should have had access to? He did have access to it. He named a representative. They got a copy of the notice. He could have conferred with them about what his situation was. The only quick response I could with that statement is I would just read the Comer case versus Peake, Your Honor, in a minute. Pretty clear there that non-attorney representation is not the equivalent, not even close to attorney representation. And just to finish off, the two aspects, I discussed the first one. The second one is the VA in this adversarial quasi-criminal proceeding has a due process obligation to bring its witnesses to prove its case beyond a reasonable doubt. That's my argument. And the question is, shouldn't the veteran know that by waiving it, it's effectively relieving the government of that obligation? That's a huge waiver. And I just believe that the government is asking the veteran to waive too much on too little notice. Do you want to save the rest of your time for rebuttal? Thank you, Your Honor. Thank you. Mr. Hockey. Good morning. Welcome back to the court. Good morning, Your Honor. May it please the Court. Could I ask you a practical question before you launch into your argument? Is the veteran still receiving disability benefits or have they been entirely cut off as a result of his conduct? I believe they've been cut off, Your Honor. So that he not only owes the government for some $96,000 covering misconduct in the period 2000 to 2004, but in addition, as of the time of the proceedings here under review, any further benefit payments were also cut off. Is that right? Well, as I understand how the regulations work, the benefits that he was receiving at the time were terminated, although the regulations allow at the time of the final decision to actually. No, it's still a lie. He may not. I have to step back a second. Well, let me ask it this way. If we were to affirm, would that mean that his future flow of benefits would be terminated as well as he would have the $96,000 debt for the four years for which he was cited for misbehavior? I think that would be correct. And the four years, that's prior to the regulation, which talks about when the effective, if you will, effective date of the termination begins, which is in this case the date after the first fraudulent activity. Does that mean the $96,000 represents all of his benefits from the day of the first false affidavit to today?  I don't know because the notice was issued a couple of years ago. I think the notice was issued in 2005, so it's definitely something less than that, what you just described. But I don't know precisely. Isn't it the case that although the notice discussed the facts in considerable detail and identified the adverse witnesses, is it the fact that he was not given copies of the affidavits and depositions of those adverse witnesses? Based upon the record, I think the inference would be that he did receive copies of the affidavits. Why do you say that? Because if you look at his response and his citations to particular affidavits, it appears to us at least that he did possess them. But I'm not aware, and there's nothing in the record that indicated that the actual affidavits were attached to the notice, if that's the court's question. But again, the inference would be that he received them given the detailed descriptions contained in his response. Now, in terms of the notice, it's very clear that it says he can have an attorney, he can have a hearing, he has an option, Manila or Washington, and so forth. We all know what it says. But it also says that the witnesses he'd have to pay for. I wonder if that's really accurate. If witnesses can be subpoenaed, and if they are subpoenaed, the statute granting the secretary and his designee subpoena authority says that they'll be paid witness fees the same as in a district court, which would mean the government would pay for the appearance of the witnesses, not the veterans. Well, all I know, as we described in our briefs, the purpose of the warning about the expenses was simply to put the veteran on notice as to what the potential cost would be. But the problem is, if I'm the veteran and I have very little money, the notice tells me, yeah, you can have a hearing and you can bring witnesses, but you have to pay for them. So I'm saying, well, gee, I can't do that. I don't have money to do that, so I better skip the hearing. Whereas, in fact, the government would pay for the witnesses, not the veteran. Perhaps in a particular situation the government might, but I think by and large the witnesses would be paid. Well, it was your argument, I thought. I thought it was a central argument in your brief that if he wanted to have a hearing, he could have had a hearing. If he wanted to cross-examine the witnesses against him, he could have had them subpoenaed and then cross-examined them at a live hearing. But the notice makes it sound like, well, yeah, you can get all that, but only if you, the veteran, pay for that. And in that sense, I wonder if the notice isn't misleading. The facts are that the notice says what it says, and to the extent the regional office subpoenas somebody, I think we'd have to brief further the question of who pays for the subpoena, but I do understand there are regulations. The statute that you cited says that the government will pay the same fee to the subpoenaed witness at a forfeiture hearing as is paid to district court witnesses. So I don't think there's any doubt about who would pay. There might be a question of whether he could subpoena anybody he wanted, but assuming that it was a legitimate witness, it seems to me clear that the government is going to pay, but the notice says no, you are going to pay. I think that's very misleading, especially in the context of many Filipino veterans who seem to be very short of funds. That may be an issue, Your Honor, but in this case there's been no suggestion on the record that this individual did not elect to go for the oral rather than the written path because of some kind of financial problems. Indeed, it would appear that he had no problem contacting the witnesses that he would have otherwise called at the hearing and obtained affidavit testimony from those same witnesses and submitted that on his behalf. So it wasn't a question in this case of, it doesn't appear to be and there's no suggestion on the record that there's a question of expense that put him off from the oral path. It seems that he just preferred to follow the written option. So to that extent, even if the court were concerned about some of the aspects of the notice, there would be a question of whether or not there's any harm in this case, which is a factor that the court should consider and this court in Gamble noted that, in fact, even in a constitutional setting. Do you agree with the opposing counsel that this forfeiture proceeding has to be considered to be a quasi-criminal proceeding? No, I don't. And do you disagree also with the assertion by Mr. Lipman that the nature of the proceeding requires in every case a live hearing? No. Again, what's your authority for how you would categorize this proceeding versus the characterization that Mr. Lipman gave? Well, I'm not aware of any regulation or any rule that would preclude the application of 38 CFR 3.103, which I believe is the general regulation dealing with hearings and things, which applies to any hearing. And this is, like Your Honor just mentioned a moment ago, a VA hearing. So the same procedures would apply. There's nothing different about this hearing necessarily than any other VA hearing. So I don't see a quasi-criminal aspect to it or anything of that nature. Well, doesn't the $96,000 that he's been told he owes the government function in practical effect as a civil fine? He did bad things, therefore he owes $96,000 to the government.  So he submitted his response in August of 2003. At that time, he hadn't received a notice of forfeiture or anything. He just received a notice of proposed action by the VA. So he wasn't under any threat of $96,000. That hadn't been articulated at that time. So at the time he's receiving the notice, he's received notice that there are some concerns by VA that he's engaged in some kind of improper activities involving these other claims that the record talks about. And so at that point he responds. And he could have responded by requesting the hearing. He could have responded as he did by submitting a very detailed written response complete with numerous attachments, including the affidavits of the very individuals he now suggests that he wanted to talk to. What's in the record that would indicate he was put on notice that perhaps his compensation would be terminated and he would have to pay the back pay in addition? Well, I think the proposed notice talks about what happened to him and that he was going to lose his benefits. Chief Judge Michel's reference was to this, as I recall, 2005 letter, which was issued later. Let me just try to look it up here. But, you know, if the question is, was he put on notice at the time of the proposed action that he was in danger of losing his benefits? Yes, he was. I don't think they monetized him at that time. Well, would he also notify that he might have to pay back compensation in addition to future compensation, the termination of it? The statement was the notice quoted the statute, which just refers to the fact that you will forfeit all rights, claims, and benefits under all laws administered by the VA. It says here on this page 89 of the appendix, if you are currently in receipt of benefits and it is determined that your rights be forfeited, your benefits shall be discontinued effective of the commencing date of the award or the date preceding the commission of the act resulting in the forfeiture, whichever is later. So he is put on notice as to the scope of his loss. And that's what I referred to earlier in response to Chief Judge Michel's question is the date. It's the later of the two dates, whether the date of his award, which in this case actually was well before the commission of the event. So that dates out. It's the latter date of the day before the whatever factual finding it is. So it's sort of similar to the way the VA approaches effective dates with respect to claims for benefits. So he certainly was put on notice at the time he received the proposed action. Do you know the distance between where Del Rosario resided and the Manila office? I don't know the distance to that. The Philippines is far along the pelago of islands. If his home city was 900 miles away on a different island, it might have been awfully expensive for him to take advantage of the hearing and have to pay to bring favorable witnesses with him. It could have cost quite a lot. As I understand it, and I confess now it doesn't seem to be in the notice at all, I'm not so sure that VA doesn't have the ability to send folks. But it says Manila, does it not? It does say Manila or obviously. Or Washington, even further. Obviously he's not coming to Washington. But the question is how much of an expense would it have been for him to go had he elected the live hearing and take his witnesses that the notice tells him he has to pay for from his home city to Manila? I don't know the answer to that, Your Honor. I do know the record shows that Mr. Del Rosario spent a great deal of time at the VA offices because, as the record shows, he spent time helping individuals file claims. Where? We believe in the VA offices in Manila where he was trying to actually have an office adjacent to the VA facilities there. And there's some question back and forth early. There's two investigations that he was sort of involved with. The record actually, even the joint appendix, has some of the earlier one where he was holding himself out as a representative for claimants, although VA hadn't recognized him as such. And there's evidence in there that indicates that he was actually co-located with the VA folks in the Philippines. I looked at a map, and actually it looks like it's quite close in this case. It looks like it's a satellite city or even a suburb of Manila. One indication was that as the crow flies, it was like four miles, and by some coastal road it was 15 kilometers or something like that. But the notice is the same notice they use for everybody, and it could apply to somebody who was 1,000 miles away. And that would be a concern that to the extent VA wants to revisit this notice, they may do so. But, again, I emphasize that in this case there's nothing in this record that suggests that there was actually some harm as a result of those concerns. Now, did he submit affidavits from the same three people who were the principal witnesses against him, namely the two widows and Applicator? Two of the three, Mr. Applicator and Ms. Achura. He did not submit a statement from the second widow and the third witness. There's no explanation as to why, but he did submit affidavits on behalf of those two. And, as the Court will know, and actually there's a copy of it in here, managed to procure on page 75 of the Joint Appendix a doctor's report concerning the mental state of Mr. Applicator. Is there an issue of materiality here? It wasn't clear to me from the briefing why it would matter whether the two deceased Filipino soldiers were in Camp O'Donnell or not in Camp O'Donnell. I think it's a question of, I think the question is larger than that, but the Camp O'Donnell affidavit sort of answered that question, which is, did they serve the military? Were they qualified under various VA laws to even receive these benefits? I thought if you were in the Filipino Army, which was allied and fighting with the U.S. Army against the Japanese forces, that you were treated for purposes of benefits pretty much the same as if you had been in the U.S. Army. So it seems like it's his status and service in the Filipino Army, not whether he was in any POW camp, much less Camp O'Donnell. That's the operative fact. Now, I can respond to this, Your Honor, based upon my general knowledge in the VA world, but not in this case. But it's my experience in other cases involving Filipino veterans that there's always been a concern as to the documentation level of folks that were or were not in the Filipino Army. So apparently the government in the Philippines doesn't have the greatest records in the world, so what often happens, it may be very well in this case these guys served, their records don't exist, so they asked for an alternative basis to connect them to the U.S. government. All right, thank you. Mr. Lippman, you have about three minutes. All right. On the point of contention of what is the nature of a forfeiture proceeding, page 27 of the opening brief, I quoted the then-Deputy Administrator who described the difficulty, this sort of unusual situation that arises in a forfeiture. And I'm quoting, and he says, we are not informed of any comparable forfeiture available to other federal agencies. Administrative forfeiture proceedings are not surrounded by the safeguards of a criminal trial, although forfeiture is in the nature of a criminal penalty. So I'm just a little unclear as to why the government isn't willing to accept this characterization of the forfeiture proceeding now. Do you have any case authority that holds that a VA forfeiture proceeding is criminal or quasi-criminal? I don't think it's been addressed yet, Your Honor. I would point to the fact that The answer is no, you don't have such a case. Okay. I would point to the fact that there is a criminal standard of proof beyond a reasonable doubt. That's not contested, right? The VA agrees that they had to prove it beyond a reasonable doubt. So it seems to me it has many of the trappings. Yeah, but of course there's a big difference. If you get convicted of a crime, you go to jail. If you lose a forfeiture case, you lose money, but you don't, you're not at risk of going to jail. Yeah, but I mean he, I guess it depends. So it's not illogical that there might be different levels of safeguards. True, except that he lost so much money on this, and so many of the veterans do. I mean, you'd almost say that I don't know how much time he would spend in jail, if any. But the fact that he lost his whole livelihood and actually has to, and actually is going to have to be, is going to be disgorged, $100,000, I don't know, it's close. I mean, it depends on your values, I guess, but I would say it's quasi-criminal. Well, he may be judgment-proof as to the $96,000. It's true that if his benefits are cut off as of some date, that's a stream of income he won't be getting, no doubt about that, and no one is suggesting that's inconsequential, but you're equating it with a criminal conviction. That seems like a bit of a stretch to me. Another way to look at it, Your Honor, is that when Congress was drafting the statute, they did it just to apply it in the Philippines, and the reason being is that claimants that are domiciled in the U.S. could be handled through criminal action, so it doesn't apply. So it just seems to me all the intent in drafting the statute, beyond the reasonable doubt, seems to me it has so much, so much of what we consider a criminal action, that so much writing on it, with all the other factors I talked about, it seems to me that there needs to be more advisement, and I'm not saying, I think you might have misstated my position. But your opinion as a lawyer, or my opinion as a lawyer, doesn't seem very important. If Congress or the Constitution command it, then it has to happen. But if you or I or any other individual thinks that as a matter of policy, as a matter of preference, as a matter of sound administration, it should be treated like a criminal matter, that's quite different. That doesn't have any legal consequences. I suppose that would be something for the Secretary to consider when he issues the regs that govern these procedures. I'm not sure if that's the way, Your Honor, because I don't think they have criminal jurisdiction. I think the way you have to look at it is use the formula that you see in the Matthews v. Eldridge. That might be helpful in trying to characterize it. Look at the private interests involved. Look at how the government is proceeding, the amount, what it's subject to. Well, we have all the authorities that you've cited to try to provide a legal underpinning for your argument that this has to be viewed as something close to a criminal case. We have that. We can refer to those. I guess I'm not sure why. It seems to me that it is for the Court to determine whether it's a quasi-criminal. I'm not sure you need Congress to characterize it. It seems to me that it's very much a legal question for this Court. All right. Thank you both. The case is submitted.